# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 05 2019, 5:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Harold E. Amstutz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of A.B. (Minor Child),

    and

M.B. (Father),

*Appellant-Respondent,*

      v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

March 5, 2019

Court of Appeals Case No.
18A-JT-2568

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No.
79D03-1801-JT-1

**Bailey, Judge.**

# Case Summary

[1] M.B. ("Father") appeals the termination of his parental rights to A.B. ("Child"), upon the petition of the Tippecanoe Department of Child Services ("DCS"). He presents the issue of whether DCS established, by clear and convincing evidence, the requisite statutory elements to support the termination decision. We affirm.

# Facts and Procedural History

[2] On March 8, 2015, Child was born to Father and his wife, J.B. ("Mother").[1] Mother and Father separated after Mother committed battery upon Father, while Father was holding Child. Father moved to a hotel; Mother and Child became homeless. On August 30, 2016, DCS received a report that Mother was threatening to harm or abandon Child. Mother was arrested on an outstanding warrant and Child was placed in foster care. DCS caseworkers learned that Child had been the subject of eight prior DCS assessments.

[3] On September 7, 2016, Child was adjudicated a Child in Need of Services ("CHINS"). Child remained in foster care, and her parents were ordered to participate in reunification services. During the pendency of the CHINS

---

[1] Mother had two prior-born children, one of whom Mother placed in the maternal grandmother's long-term care and one of whom was placed for adoption. Father had five prior-born children, all removed from their biological home and adopted. After A.B. was born, Mother gave birth to another child, who was placed for adoption in the same home as a half-sibling.

proceedings, Father regularly participated in visitation with Child. He obtained employment and housing. However, his participation in other services was problematic. Service providers perceived Father to be angry, verbally aggressive, and generally uncooperative. His therapist terminated services due to a lack of discernible benefit to Father.

[4] Mother was incarcerated for several months and did not significantly participate in reunification services.[2] The DCS plan for Child was changed from reunification to termination of parental rights.

[5] On January 10, 2018, the DCS filed a petition to terminate parental rights. An evidentiary hearing commenced on March 19, 2018 and concluded on July 9, 2018. Child's caseworker and Court-Appointed Special Advocate ("CASA") recommended termination of parental rights. On October 18, 2018, the trial court issued its findings of fact, conclusions, and order terminating Mother's and Father's parental rights. Father appeals.

# Discussion and Decision

## Standard of Review – Sufficiency of the Evidence

[6] When we review whether the termination of parental rights is appropriate, we will not reweigh the evidence or judge witness credibility. *In re V.A.*, 51 N.E.3d

---

[2] Mother was convicted of Battery as a Level 6 felony for battering a former boyfriend. After serving a sentence of incarceration, she lost contact with DCS. It was believed that she moved to the State of Texas. Mother did not personally appear at the termination hearing and she is not an active party on appeal.

1140, 1143 (Ind. 2016). We will consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* In so doing, we give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). We will set aside the trial court's judgment only if it is clearly erroneous. *K.T.K. v. Ind. Dep't of Child Servs*, 989 N.E.2d 1225, 1229 (Ind. 2013). To determine whether a judgment terminating parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *In re I.A.*, 934 N.E.2d at 1132.

## Requirements for Involuntary Termination of Parental Rights

[7] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). Although parental rights are of a constitutional dimension, the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). The State is required to prove that termination is appropriate by a showing of clear and convincing evidence, which is a higher burden than establishing a mere preponderance. *In re V.A.*, 51 N.E.3d at 1144.

Indiana Code section 31-35-2-4(b)(2) sets out the elements that the DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

> (A) that one (1) of the following is true:
>
> (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.
> (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
> (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Analysis

Father contends that insufficient evidence supports the termination decision. He observes that the initial reason for Child's removal from his custody was that he lacked adequate housing, but he subsequently obtained a two-bedroom apartment with the assistance of the Seeds of Hope program. Accordingly, Father argues that there is a lack of clear and convincing evidence of a reasonable probability that he would fail to remedy the conditions that led to Child's removal.[3]

In determining whether conditions resulting in removal or reasons for placement outside the parental home will probably not be remedied, I.C. § 31-35-2-4(b)(2)(B)(i), the reviewing court engages in a "two-step analysis." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). First, we identify the conditions that led to removal; and second, we must determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge parental fitness as of the time of the termination hearing, taking into consideration the evidence of changed conditions. *Id.* (citing *Bester*, 839 N.E.2d at 152). The trial court is entrusted with balancing a parent's recent improvements against habitual patterns of conduct. *Id.* The trial court has discretion to weigh a parent's prior history more heavily than

---

[3] Father also contends there is no evidence that he poses a threat to Child. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address the additional claim. *See In re L.S.*, 717 N.E.2d at 209 (recognizing that the court need only find that one of the three requirements of subsection (b)(2)(B) was established by clear and convincing evidence).

efforts made only shortly before termination. *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[11] Child was removed from Mother's physical custody after Mother apparently threatened to harm Child. At that time, Father was not residing in permanent housing and he could not provide necessary stability for Child. The trial court, in its termination order, focused at length on Mother's conduct and ultimately concluded that Mother abandoned Child. With respect to Father, the trial court acknowledged that he had obtained housing and employment, but also found that his hostility to service providers had undermined reunification efforts. In relevant part, the judgment stated:

> Father has a valid driver's license and a vehicle for transportation. During the CHINS case, Father has generally remained employed occasionally donating plasma for extra income. At the time of the termination hearing, Father was employed as a temporary employee at CAT logistics working second shift at $14.50 per hour. Father obtained housing on March 1, 2018 through the Seeds of Hope program which provides last resort housing, case management, and conflict resolution. Father has generally complied with program guidelines and currently resides in an appropriate two (2) bedroom apartment.

> Despite such employment, Father failed to provide information to establish a budget until recently. During periods of the case, Father was dishonest about budgeting, interactions with other unapproved persons, and misuse of medications. Father never participated in any case management services as ordered.

Father participated in individual counseling between March 2017 and December 2017. Father has a history of trauma. Father has no formal diagnosis but reports depression and demonstrates symptoms of post-traumatic stress disorder (PTSD) and anger issues. During the CHINS case, Father made vague threats toward DCS and CASA systems. Father made some initial therapeutic progress in utilizing coping skills but became angrier and more resistant to therapy over Summer 2017. Father was repeatedly redirected to focus on his own issues and progress rather than blaming everyone else. Father struggled to accept any responsibility for his circumstances. Father was discharged for lack of therapeutic progress.

During the CHINS case, Father never provided requested information regarding childcare plans. … At the time of the termination hearing, Father was not participating in any services with the exception of supervised parenting time.

Father attended supervised visitation services between October 2016 and December 2016. Father's interaction with the child could be appropriate at times. However, Father had unrealistic developmental expectations for the child and engaged in power struggles with the child. … The visit facilitator recommended therapeutically supervised visits based on Father's inappropriate behavior and progressively "strange" conversation. For example, Father discussed living in Hawaii where the dolphins rape tourists.

During supervised visits between February/March 2017 and [the] end of May 2017, Father demonstrated an ability to meet the child's basic needs. Father's parenting time progressed to overnight weekend visits. During overnight visits in Summer 2017, Father refused to allow access to a bedroom in his home stating the door was locked. Eventually, Father opened the bedroom door at which time no safety concerns were identified. A blanket and an ashtray were observed in the bedroom. Father

later refused to allow access to his entire home. The parties discussed a trial home visit that never occurred after Father became involved with a known substance user involved in her own CHINS case.

Thereafter, Father's demeanor at visits was angry and resentful. The child displays a blank stare and shuts down when Father's demeanor and behavior become aggressive and angry which can last the entire visit. Father is observed pacing rigidly with clenched fists making aggressive comments. In May 2018, Father threatened that if he went to the DCS office to complain about the locations of visits, he would be going to jail. …

CASA notes that when a negative event occurs during Father's parenting time, the child will defecate in her pants and smear feces on the wall upon returning to the foster home.

Appealed Order at 4-6.

[12]   Although Father had been displaced by domestic violence, he was commendably able to achieve important objectives. He obtained housing and full-time, second-shift work. However, he was unable to verify that any child care arrangements had been made for Child. Father appeared to be somewhat familiar with neighborhood child care centers but could not name a facility where Child was either accepted or on a waiting list. No individual he had identified as willing to provide child care had participated in a background check. Thus, Child's need for supervision during Father's evening work hours remained unmet.

[13] Moreover, service providers testified they had unalleviated concerns that Father did not understand Child's developmental limitations or appreciate the need for constant vigilance to ensure a toddler's physical safety. They perceived Father as being resistant to assistance offered to improve his parental skills. Father had slammed the door on a family case manager and on another occasion texted his refusal to speak with anyone other than his child during morning hours. He also had expressed his intention not to work with "anyone who has estrogen," (Ex. Vol. I, pg. 114), and had made derogatory comments about women in Child's presence. Father was assigned a male parenting time facilitator at one point, but that provider testified that Father was argumentative and "very verbally, borderline aggressive." (Tr. Vol. II, pg. 58.) Father had insisted that visitation take place in the community instead of an office, prompting early cancellation of the visit. He then advised the supervisor that he was "going to jail" if he went to DCS to discuss the matter, and he told Child DCS was "keeping you from me." *Id.* Father's other inappropriate commentary during visitation prompted a change to therapeutic visitation. His expressed focus on destruction of DCS premises prompted cancellation of his individual therapy. In short, providers could not work with Father to achieve reunification.

[14] Father concedes having anger or frustration directed toward DCS but observes that DCS neither alleged nor documented physical aggression on his part. He also argues that the trial court considered remote circumstances suggesting instability but should have emphasized his current stability – housing and employment. At bottom, Father requests that we reweigh evidence. Viewed in

the light most favorable to the judgment, the evidence most favorable to the judgment supports the challenged findings. DCS presented clear and convincing evidence from which the trial court could conclude that there is a reasonable probability that the conditions leading to Child's removal or reasons for her placement outside the home will not be remedied.

[15] Father also contends that the DCS did not present clear and convincing evidence that termination is in Child's best interests. In determining what is in a child's best interests, the court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. We have previously held that recommendations by the case manager and CASA to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59. Here, there is evidence that Child is thriving in foster care and is bonded with her foster parents and foster siblings. Although Father regularly visited with Child, significant concerns were never alleviated, and the visits never progressed to an in-home trial placement. Verifiable child care arrangements were not in place. The CASA and case manager recommended termination of Father's parental rights. Considering the totality of the evidence, DCS met its burden of proof regarding Child's best interests.

# Conclusion

[16] DCS established by clear and convincing evidence the requisite elements to support the termination of parental rights.

[17] Affirmed.

Bradford, J., and Brown, J., concur.